**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **ANTONIO ALVAREZ** | : | |
| **Plaintiff,** | : | |
| | : | **No. 3:19-cv-723 (VLB)** |
| **v.** | : | |
| | : | |
| **CITY OF NEW BRITAIN, ET AL.** | : | **September 15, 2021** |
| **Defendants.** | : | |
| | : | |
| | : | |
| | : | |

**MEMORANDUM OF DECISION DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DKT. 45**

On Thanksgiving night in 2018, New Britain police officers Adam Capowski ("Det. Capowski") and James McColgan ("Ofc. McColgan"), referred to collectively as the "Responding Officers," investigated a complaint that Antonio Alvarez ("Plaintiff" or "Mr. Alvarez") was flashing his vehicle's headlights into his neighbor's windows. [Dkt. 27 (Am. Compl.) ¶¶ 9-10]. Mr. Alvarez alleges that, as he walked away from Det. Capowski, the officer, "…without any justification whatsoever[,]… tackled the Plaintiff from behind, forcibly bringing him to the ground on top of sheetrock that was leaning on the side of Plaintiff's garage." [Am. Compl. ¶ 15]. Ofc. McColgan then struck Mr. Alvarez repeatedly on his head and torso and eventually broke and dislocated Mr. Alvarez's left elbow. [Am. Compl. ¶¶ 16-21].

Several months later, Mr. Alvarez was arrested pursuant to a warrant and charged with two counts of assault of public safety personnel in violation of Conn.

1

Gen. Stat. § 53a-167(c) and one count of breach of peace in the second degree in violation of Conn. Gen. Stat. § 53a-191 related to the incident.

Plaintiff initially filed the complaint in Superior Court for the State of Connecticut alleging a bevy of civil rights and tort claims against the City of New Britain and the Responding Officers (collectively "Defendants"). [Dkt. 1 (Not. of Removal, Compl.)]. Defendants removed the case to this District, invoking the Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331. [*Id*.]. Plaintiff voluntarily dismissed certain causes of action through an amended complaint and again after Defendants moved for summary judgment. The following claims remain pending:

> Count One: Violations of Rights Secured by 42 U.S.C. § 1983 and the Fourth, Eighth and/or Fourteenth Amendments to the United States Constitution Due to the Unreasonable Use of Force as to the Responding Officers;
>
> Count Two: Violations of Rights Secured by Article I, §§ 7, 8 and/or 9 of the Connecticut Constitution Due to the Unreasonable Use of Deadly Force as to the Responding Officers;
>
> Count Three: Negligence and Liability of the Responding Officers and The City of New Britain Pursuant to Conn. Gen. Stat. §§ 52-557n, *et seq.*;
>
> Count Five: Indemnification of employees by a municipality pursuant to Conn. Gen. Stat. § 7-465;
>
> Count Six: Violations of Rights Secured by 42 U.S.C. § 1983 through the Fourth, Eight and/or Fourteenth Amendments to the United States Constitution and the Connecticut Constitution, Article 1, Sections 7, 8 and 9; for Failure to Intervene as to the Responding Officers;

For reasons set forth herein, the Court denies Defendants' motion for summary judgment.

## Preliminary Matters

Before addressing the merits, the Court will briefly address Plaintiff's motion to strike Defendants' Local Rule 56(a)(1) Statement. [Dkt. 48]. Local Rule 56(a)(1) provides, in relevant part:

> A party moving for summary judgment shall file and serve with the motion and supporting memorandum a document entitled "Local Rule 56(a)1 Statement of Undisputed Material Facts," which sets forth, in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3, *a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried*. The Local Rule 56(a)1 Statement should include only those facts that are material to the decision of the motion. *The Local Rule 56(a)1 Statement shall be no longer than twelve (12) double-spaced pages, absent leave of the Court granted for good cause shown*.

(emphasis added).

Plaintiff moves to strike the Defendants' Local Rule 56(a)(1) statement because it was twelve single-spaced pages and therefore double the page limitation set by Local Rule 56(a)(1). [Dkt. 48]. Defendants oppose Plaintiff's motion on the grounds that motions to strike statements contained in a Local Rule 56(a) statement are prohibited by Local Rule 56(a)(4). [Dkt. 49 (Def. Obj. to Pl. Mot. to Strike)]. Defendants further argue that only 17 of its 84 statements of material fact exceed the page limit and that an expansion of the page limit *nunc pro tunc* is reasonable because of the factual complexity of the case. [*Id*.]. The next day, Defendants moved for an expansion of the page limit *nunc pro tunc*, raising the same arguments as the objection and counsel's inadvertent oversight of the page limitation. [Dkt. 50].

3

The Court GRANTS Plaintiff's motion to strike and DENIES Defendants' motion to expand the page limitation *nunc pro tunc* for failure to show good cause. The purpose of the Local Rule 56(a) statements is for the Court to readily ascertain where genuine disputes of material facts may lie. *See Ricci v. Destefano*, No. 3:04 CV 1109 JBA, 2006 WL 2666081 (D. Conn. Sept. 15, 2006) (explaining the impetus of the local rule). Given the expansive records generated in modern discovery practice, the rule is necessary for the "just, speedy, and inexpensive determination of every action and proceeding." *See* Fed. R. Civ. P. 1. The purpose of the rule is frustrated by the inclusion of immaterial facts and unnecessary prolixity in a parties' Local Rule 56(a) statement. With the purpose of the rule and the materiality requirement in mind, the page limitation is a necessary corollary.

While excessive force and malicious prosecution claims are factually specific, the events in this case are discrete and involve only three party-witnesses. Further, had counsel exercised diligence and identified only those issues that were material to the dispute, an expansion of the page limitation would have been unnecessary. For example, paragraphs 73-84 pertain to a criminal mischief charge that arose from conduct that predated the Thanksgiving 2018 use of force incident. These statements provide context, but the details are not material to any claims or defenses. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("…[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). Other paragraphs include extraneous details, such as the

4

location of decals on the Responding Officers' vehicles and the color of their footwear. *See, e.g.* [Def. Local Rule 56(a) Statement ¶¶ 3-4].

Local Rule 56(a)(4)'s prohibition against motions to strike statements made in parties' 56(a) statements or supporting evidence is directed at preventing redundant and unnecessary evidentiary disputes. *Ricci*, 2006 WL 2666081, at *3 (Motions to strike directed at summary judgment briefings "are unnecessary and produce only redundant statements by the court that it has not relied on such inadmissible evidence in deciding the summary judgment motion."). Local Rule 56(a)(4) is inapplicable because Plaintiff's motion to strike does not concern the content of the statements or any summary judgment exhibits.

The Court will disregard paragraphs 68 through 84 of Defendants' Local Rule 56(a)(1) statement. Ultimately, given the materiality requirement and factual disputes about events immediately preceding the Responding Officers' use of force, this ruling does not affect the disposition of the Defendants' dispositive motion.

## Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be

drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson*, 477 U.S. at 255; *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb*, 84 F.3d at 518); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).   Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment

may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

**Background**

With the exception addressed above, the following facts are taken from the Local Rule 56 statements of material facts and evidence cited by the parties. The facts are read in the light most favorable to the non-movant, Mr. Alvarez. *Anderson*, 477 U.S. at 255.[1]

Mr. Alvarez, then age 66, is a long-term resident of New Britain, Connecticut. [Dkt. 52-2, Pl. Ex. A (Alvarez Depo.) at 7:17-7:24, 25:14-23]. Mr. Alvarez was good friends with his neighbor for many years, but their relationship deteriorated and became acrimonious. [*Id.* at 73:04-79:09].

Around 8:35 P.M. on Thanksgiving night in 2018, Mr. Alvarez's neighbor called the police to report that he was flashing his headlights into the neighbor's windows. [Defs. Local Rule 56(a)(1) Statement ¶ 2]. Mr. Alvarez admitted to flashing his truck's high-beam headlights but claimed that he was doing so to celebrate the beginning of the Christmas season, rather than to annoy his neighbor. [Pl. Ex. A (Alvarez Depo.) at 107:11-108:10, 112:21-114:25]. Before approaching the scene, the Responding Officers observed that the truck in Mr. Alvarez's driveway was occupied, its headlights were on, and its high-beam lights were repeatedly flashing.

---

[1] Citation to the Defendant's Local Rule 56(a)(1) statement is applicable where the factual statement is undisputed. For ease of reference, exhibits will refer to evidentiary exhibits included with the Defendants' Motion for Summary Judgment [Dkt. 45] and Plaintiff's Opposition [Dkt. 53] by exhibit only. i.e. [Defs. Ex. A] and [Pl. Ex. A]. Plaintiff's exhibits are incorrectly marked-pursuant to Chambers Practices plaintiffs' exhibits are to be marked numerically.

[Defs. Local Rule 56(a)(1) Statement ¶¶ 5-7]. Ofc. McColgan, who was familiar with Mr. Alvarez, approached the vehicle. [Defs. Local Rule 56(a)(1) Statement ¶¶ 8-10]. Ofc. McColgan knew Mr. Alvarez because he previously handled a report that Mr. Alvarez made about property that was stolen from his home. [Dkt. 53-4, Pl. Ex. C (McColgan Depo.) at 13:17-14:19].

The parties agree that a key was in the vehicle's ignition and there was a partially consumed bottle of beer in the vehicle. [Defs. Local Rule 56(a)(1) Statement ¶ 10]. Mr. Alvarez exited the vehicle upon observing the Responding Officers in his driveway, approaching on foot. [Pl. Ex. A (Alvarez Depo.) at 143:02-143:13]; [Pl. Ex. C (McColgan Depo.) at 15:12-15:16]. The parties dispute Mr. Alvarez's behavior and emotional state upon exiting the vehicle. In his police report and subsequent arrest warrant affidavit, Ofc. McColgan described Mr. Alvarez as "confrontational" during their initial encounter. [Defs. Ex. F (11/22/2018 Police Report) at 3]; [Defs. Ex. E (03/10/2019 McColgan Arrest Warrant Aff.) at 5]. However, when asked in his deposition whether Mr. Alvarez exited the vehicle in an aggressive fashion, Ofc. McColgan responded that "[h]e did so in an impaired manner." [Pl. Ex. C (McColgan Depo.) at 15:17-15:19]. Ofc. McColgan observed that, in addition to the open container, Mr. Alvarez had bloodshot eyes, he was slurring his speech, and he was stumbling and swaying as he exited the vehicle. [Defs. Ex. F (11/22/2018 Police Report) at 3]; [Defs. Ex. E (03/10/2019 McColgan Arrest Warrant Aff.) at 5].

Mr. Alvarez described his overall temperament as "calm," including after he drinks alcohol. [Pl. Ex. A. (Alvarez Depo.) at 127:02-128:02]. He admitted to drinking

three beers that day but denies slurring his words. [*Id*. at 143:14-143:18]. He testified that he did not feel intoxicated, but instead felt "relaxed" and that he drank beer while cooking and listening to Christmas music. [*Id*. at 120:01-120:14]. Mr. Alvarez initially testified that he did not recall the time period over which he consumed the beers. [*Id*. at 178:02-178:04]. However, he estimated that it was over the course of four or five hours after his attorney asked a leading question over opposing counsel's objection. [*Id*. at 178:05-178:13].

Jumping ahead momentarily, Mr. Alvarez arrived at the hospital an hour after his encounter with the Responding Officers. [Pl. Ex. H (Hosp. Records) at 2]. The hospital did not test Mr. Alvarez's blood alcohol content while treating him for injuries. [Defs. Local Rule 56(a)(1) Statement ¶ 64]; [Pl. Ex. H (Hosp. Records)]. The emergency room physician observed that Mr. Alvarez was "alert, pleasant and oriented" and that his "mood and manner [were] appropriate." [Pl. Ex. H (Hosp. Records) at 4].

Construing ambiguity in the record in favor of Plaintiff, as the Court must at summary judgment, the Court concludes that there is a genuine dispute of material fact as to Mr. Alvarez's behavior and conduct upon exiting the vehicle. Mr. Alvarez has not rebutted the evidence tending to show that Ofc. McColgan reasonably suspected that Mr. Alvarez was under the influence of alcohol to some degree or that he suspected that his actions were directed at annoying his neighbor. It is undisputed that he questioned the Responding Officers about why they were on his property. [Defs. Local Rule 56(a)(1) Statement ¶ 11]. His protestation alone does not irrefutably establish that he was "confrontational." A reasonable jury could

reach differing conclusions about whether Mr. Alvarez was belligerent towards the Responding Officers, regardless of his level of impairment.

It is undisputed that, at some point after their initial encounter, Ofc. McColgan walked to the complaining neighbor's apartment while Det. Capowski remained with Mr. Alvarez. [Defs. Local Rule 56(a)(1) Statement ¶¶ 20-21]. Ofc. McColgan's decision to leave Det. Capowski alone with Mr. Alvarez further suggests that they did not view him as a safety risk at that time.

The parties dispute the sequence of events that occurred next. According to the Defendants, shortly after Ofc. McColgan walked across the street to speak to the complainant, Mr. Alvarez stood up quickly and walked to the garage door, towards his residence. [Defs. Local Rule 56(a)(1) Statement ¶ 20]. Det. Capowski then asked Mr. Alvarez where he was going and ordered him to sit back down. [Defs. Local Rule 56(a)(1) Statement ¶ 21]. Mr. Alvarez refused to sit back down, immediately opened his garage door, and then attempted to proceed into the garage. [Defs. Local Rule 56(a)(1) Statement ¶¶ 22-23]. Det. Capowksi observed an axe in the garage and then took hold of Mr. Alvarez's jacket to prevent him from entering the garage. [Defs. Local Rule 56(a)(1) Statement ¶¶ 23-24]. Mr. Alvarez became more agitated and attempted to push Det. Capowski's arm away while continuing to proceed into the garage. [Defs. Local Rule 56(a)(1) Statement ¶¶ 25-27]. This prompted Det. Capowski to tackle or shove Mr. Alvarez onto the ground and onto several sheets of drywall. [Defs. Local Rule 56(a)(1) Statement ¶¶ 26-28]. Det. Capowski ordered Mr. Alvarez to stop resisting and put his hands behind his back. [Defs. Local Rule 56(a)(1) Statement ¶¶ 28-29]. Mr. Alvarez continued to resist

by pushing up despite Det. Capowski's efforts to maintain control by using his body weight. [Defs. Local Rule 56(a)(1) Statement ¶¶ 30-31].

Mr. Alvarez's testimony offers a different version of events. Mr. Alvarez testified that he never sat down while speaking to the officers. [Pl. Ex. A (Alvarez Depo.) at 148:10-148:21]. Mr. Alvarez testified that neither officer ordered him to sit down at any time after they approached him in his driveway. [*Id.* at 148:16-148:21]. It is undisputed that Mr. Alvarez walked towards the garage door and Detective Capowski asked him where he was going. [Defs. Local Rule 56(a)(1) Statement ¶¶ 20-21]. Upon opening the garage door, Mr. Alvarez heard Ofc. McColgan yell "don't let him go" to Det. Capowski. [Pl. Ex. A (Alvarez Depo.) at 151:14-152:07]. Mr. Alvarez testified that Det. Capowski put his hand "[i]n my back. (sic) And he pushed me to the ground." [*Id.* at 152:13-153:07]. He further testified that:

> Q: Antonio, when the officer put his hand on you, did you attempt to push the hand away?
>
> A. No.
>
> Q. When you felt the hand of the officer on you, did you keep walking or did you stop?
>
> A. He pushed me to the ground.
>
> Q. Now when you say he "pushed" you to the ground, did you actually fall to the ground?
>
> Yes. To the front.

[*Id.* at 153:11-153:19].

Consequently, there is a genuine issue of material fact as to whether Det. Capowski ordered Mr. Alvarez to stop either by a verbal command or by taking hold

of his jacket to prevent his movement with sufficient time for him to comply before forcing him to the ground.

There is no dispute that there was an axe near the entry way of the garage. [Defs. Local Rule 56(a)(1) Statement ¶ 23]. However, Det. Capowski testified that Mr. Alvarez never threatened to physically harm either Responding Officer. [Def. Ex. B (Capowski Depo.) at 56:14-56:20]. Det. Capowski also testified that he tackled Mr. Alvarez and employed a "sprawling technique" to control his movement because he saw the axe in the garage and Mr. Alvarez was traveling in that direction. [*Id*. at 59:04-59:24]. He testified that Mr. Alvarez did not reach for the axe because Det. Capowski had control of his arms. [*Id*. at 59:17-59:20]. A reasonable inference can be drawn that Det. Capowski tackled Mr. Alvarez preemptively.

Ofc. McColgan testified that he heard a muffled sound over the police radio, which he recognized as Det. Capowski's voice. [Dkt. 45-11, Defs. Ex. G (McColgan Depo.) at 11:08-11:11]. Plaintiff denies that Det. Capowski radioed Ofc. McColgan for assistance. [Pl. Resp. to Defs. Local Rule 56(a)(1) Statement ¶ 34] (citing Pl. Ex. A (Alvarez Depo.) at 151:14-152:25). Plaintiff's testimony does not directly refute Ofc. McColgan's testimony, but instead casts doubt on the sequence of events. Since Plaintiff testified that Ofc. McColgan yelled "don't let him go" to Det. Capowski immediately before Det. Capowski shoved or tackled him, it would suggest that Ofc. McColgan was responding to the garage prior to (or in the absence of) any radio call for assistance. *See* [Pl. Ex. A (Alvarez Depo.) at 151:14-152:25].

It is undisputed that Ofc. McColgan struck Mr. Alvarez with a combination of knee and elbow strikes while Det. Capowski remained on top of him. [Defs. Local Rule 56(a)(1) Statement ¶ 39]. Although Plaintiff denies that he was actively resisting Ofc. McColgan's attempts to gain control over his left arm, he conceded that he was trying to move away from the officers by shifting his body from side to side. *Compare* [Pl. Resp. to Def. Local Rule 56(a)(1) Statement ¶ 39] to [Dkt. 45-15, Defs. Ex. K (Alvarez Depo.) at 153:03-162:20]. Ofc. McColgan testified that, following the strikes to Mr. Alvarez's chest and torso, "I go to grab his left arm to try and take it behind his body to handcuff him. Pull it back. I feel and hear something. I hear him scream." [Defs. Ex. G (McColgan Depo.) at 11:20-12:02].

Ofc. McColgan then placed him in handcuffs. [Defs. Local Rule 56(a)(1) Statement ¶¶ 40-41]. Mr. Alvarez was transported to police headquarters and then by paramedics to a local hospital after Mr. Alvarez kept screaming that his left elbow was in pain. [Defs. Local Rule 56(a)(1) Statement ¶ 49]. Medical personnel diagnosed Mr. Alvarez with a fractured and dislocated left elbow, and he was discharged the following morning. [Dkt. 53-9, Pl. Ex. H (Med. Records)].

It is also undisputed that the Responding Officers received medical treatment for minor injuries sustained during the use of force incident. [Defs. Local Rule 56(a)(1) Statement ¶ 61]. Plaintiff argues that the Responding Officers' decision to seek medical attention was pretextual because their injuries were minor and they did not seek medical attention until they learned that Mr. Alvarez was hospitalized. [Pl. Mem. in Supp. at 22-23].

The Responding Officers are both SWAT team members. [Pl. Ex. C (McColgan Depo.) at 9:06-9:08]. Officer McColgan is 5'11 feet tall and weighs 185 pounds. [*Id.* at 9:08-9:23]. Det. Capowski is 6'2 feet tall and weighs 240 pounds. [Pl. Ex. B (Capowski Depo.) at 14:24-15:04]. Det. Capowski also earned a green belt in the Marine Corps Martial Arts Program and has prior SWAT team training in hand-to-hand combat. [*Id.* at 14:01-14:07, 15:05-15:21].

On March 10, 2019, four months after the use of force incident, Ofc. McColgan submitted an affidavit in support of an arrest warrant charging Mr. Alvarez with two counts of assault of public safety personnel in violation of Conn. Gen. Stat. § 53a-167(c) and breach of peace in the second degree in violation of Conn. Gen. Stat. § 153a-18. [Defs. Local 56(a)(1) Statement ¶¶ 66-67]. The warrant was issued by a Superior Court judge on March 20, 2019. [Dkt. 45-13, Defs. Ex. E (Arrest Warrant)]. Five months later, a Superior Court judge granted Plaintiff's application for accelerated pretrial rehabilitation. [Dkt. 45-16, Defs. Ex. L (Pl. Interrog.) ¶ 4].

### Discussion

A. Parties' arguments

First, Defendants argue that Plaintiff's excessive force claims are barred by the favorable termination rule set forth in *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) and its progeny because Plaintiff must disprove the facts establishing his conviction for assault of public safety personnel to prevail on his excessive force claims. [Defs. Mem. in Supp. at 22-27]. Specifically, Defendants argue that

Plaintiff's successful acceptance into the accelerated pretrial rehabilitation program is the equivalent of a conviction. [*Id.* at 20-22] (citing *Miles v. City of Hartfor*d, 445 F. App'x 379, 382 (2d Cir. 2011) and *Roesch v. Otarola*, 980 F.2d 850 (2d Cir.1992)). Defendants argue that Plaintiff's convictions contradict his excessive force claims because assault of public safety personnel under Conn. Gen. Stat. § 53a-167(c) hinges on whether the Responding Officers were acting in the performance of their duties at the time of the assault. [*Id.* at 22-27]. Defendants also argue that Plaintiff's excessive force claims are barred by the related doctrine of collateral estoppel. [*Id.* at 27-28].

Next, Defendants argue that the Responding Officers are entitled to qualified immunity because their use of force was objectively reasonable under the circumstances. [*Id.* at 28-32]. Defendants argue that based on Plaintiff's repeated refusal to comply with Det. Capowski's orders, his persistent effort to enter the garage where a dangerous instrument was located, and violence directed at the Responding Officers, warranted their measured physical response. [*Id.*].

Finally, Defendants argue that Plaintiff's negligence claims fail because the Responding Officers are entitled to qualified immunity under Connecticut law because their conduct was subject to discretion and judgment. [*Id.* at 32-35]. The Defendants argue that, as pled, none of the three statutory exceptions to governmental immunity under Subsection (a) of Conn. Gen. Stat. § 52-557(n) are applicable to the facts as pled in the complaint. [*Id.* at 36-67].

15

In opposition, Plaintiff argues that the favorable termination rule in *Heck* is inapplicable to Plaintiff's excessive force claims. [Pl. Mem. in Opp'n at 21-25]. Specifically, Plaintiff argues that his excessive force claims do not imply the invalidity of his conviction because he alleges that the Responding Officers used force that far exceeded what was reasonable under the circumstances. [*Id*. at 22]. Plaintiff argues that the Responding Officers minor injuries, coupled with the unreasonable delay in applying for a warrant, calls into question their motivation for bringing the assault charges in the first place because Defendants were on notice of Plaintiff's claim. [*Id*. at 23-24]. Plaintiff argues that requiring him to have challenged the criminal convictions in Court "…rings hollow insofar as a criminal defendant would face a false choice of testifying against one or, as in this case, two (or more) police officers and, if a jury were to believe the officers, the defendant might be looking at a significant prison sentence." [*Id*. at 25]

Plaintiff submits that the Responding Officers' use of force was objectively *unreasonable* under the circumstances and therefore they are not subject to qualified immunity. Plaintiff argues that the Responding Officers were dispatched to what was essentially a neighbor's nuisance complaint. [Pl. Mem. in Opp'n. at 10]. Plaintiff further argues that the Responding Officers were inconsistent in their description of Plaintiff's behavior as he exited his vehicle. [*Id*. at 12-13]. Plaintiff notes that Ofc. McColgan's report and affidavit in support of the arrest warrant reported that Plaintiff was "confrontational," whereas he declined to endorse this description and instead characterized Plaintiff as "impaired" during his deposition testimony. [*Id*. at 11]. Plaintiff also argues that the Responding Officers are younger

16

and more physically imposing than Plaintiff. [*Id*. at 11, n. 2 and 12]. This would suggest that the officers could have used less force to subdue Mr. Alvarez and that he did not pose a danger to them given their relative stature.

Plaintiff further argues that "Capowski testified that he preemptively tackled Alvarez from behind, as Alvarez was walking away from him, solely because Capowski saw an axe nearby that Alvarez might have reached for, even though Capowski had already 'controlled his arms.'" [*Id*. at 11]. Plaintiff notes that it is undisputed that he never threatened either officer with physical harm. [*Id*. at 14].

As to governmental immunity, Plaintiff argues that the prohibition against police officers' use of excessive force is clearly established law. [Pl. Mem. in Opp'n at 25-27](quoting *Outlaw v. City of Hartford*, 884 F.3d 351, 364 (2d Cir. 2018); *Rogoz v. City of Hartford*, 796 F.3d 236 (2d Cir. 2015); *Amnesty America v. Town of West Hartford*, 361 F.3d 113 (2004); *Mickle v. Morin*, 297 F.3d 114 (2d Cir. 2002); and *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999)). Plaintiff argues that there are genuine issues of material fact as to the reasonableness of Ofc. McColgan and Det. Capowski's use of force in effectuating his detention and whether they intended to injure Mr. Alvarez. [Pl. Mem. in Opp'n at 26-27].

## B.  Excessive force claims

Excessive force claims are governed by the Fourth Amendment's "objective reasonableness" standard. *See Graham v. Connor*, 490 U.S. 386, 388 (1989). A police officer may use force to compel compliance, but "the use of force is contrary to the Fourth Amendment if it is excessive under objective standards of

reasonableness." *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001) (receded from on other grounds in *Pearson v. Callahan*, 555 U.S. 223 (2009)) (citing *Graham*, 490 U.S. at 388). "Police officers' application of force is excessive ... if it is objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (internal citation and quotation marks omitted). A police officer may only use the degree of force that is objectively reasonable to achieve their legitimate law enforcement objective.

Application of the objective reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal citation and quotation marks omitted). Further, this evaluation must consider all the facts of the case, including the severity of the crime, whether the arrestee posed an immediate threat to the safety of others, and whether he actively resisted the arrest. *Id*. at 396; *Carey v. Maloney*, 480 F. Supp. 2d 548, 556 (D. Conn. 2007). Though the Second Circuit has not yet ruled on the issue, many courts have viewed the "immediate threat to the safety of the officers or others" as the most important *Graham* factor. *See Brown v. City of New York*, 798 F.3d 94, 102 (2d Cir. 2015) ("All that can realistically be expected is to make some assessment as to the extent to which each relevant factor is present and then somehow make an aggregate assessment of all the factors. As is true of many methods of analysis that courts prescribe, the excessive force determination is easier to describe than to make.")

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal citations omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. For an officer to be "grant[ed] summary judgment against a plaintiff on an excessive force claim, ... no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004). In other words, "[t]he continuum along which the excessiveness of force in making an arrest is assessed is not marked by visible signposts. A court's role in considering excessive force claims is to determine whether a jury, instructed as to the relevant factors, could reasonably find that the force used was excessive." *Brown*, 798 F.3d at 103.

The Court will first consider Defendants' arguments that Plaintiff's excessive force claims are legally precluded by *Heck*'s favorable termination rule and the doctrine of collateral estoppel. Because the Court concludes that Plaintiff's excessive force claims are not precluded, the Court will consider application of the *Graham* factors.

In *Sullivan v. Gagnier*, 225 F.3d 161 (2d Cir. 2000), the Second Circuit held that a plaintiff's conviction for resisting arrest and harassing a police officer under

New York law did not collaterally estop his claim for excessive force. *Id*. at 165 (citing examples for the proposition that a "jury's return of a guilty verdict in state court for resisting arrest and/or other offenses such as assault on a police officer does not necessarily preclude a subsequent claim of excessive force in federal court."). In *Sullivan*, the Second Circuit made clear that:

> The fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some* degree of force, but it does not give the officer license to use force without limit. The force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer. It is clear, therefore, that there is no inherent conflict between a conviction for resisting arrest or harassment of a police officer and a finding that the police officers used excessive force in effectuating the arrest.

*Id*. at 165–66 (emphasis in original).

Rather than adopting a per se rule, courts in the Second Circuit apply the rules of collateral estoppel in the state where the criminal judgment was rendered. *Id*. at 166. The court must then look to which facts were necessarily determined in the criminal case to decide whether a verdict for the plaintiff would be incompatible with the excessive force claim. *Id*. at 166-67; *see e.g. Shapard v. Attea*, 710 F. App'x 15, 17 (2d Cir. 2017)(summary order) (reversing the district court's *sua sponte* dismissal of an excessive force claim where plaintiff was convicted of assaulting correctional officers); *Powell v. Scanlon*, 390 F. Supp. 2d 172 (D. Conn. 2005) (conviction for assaulting a police officer under Conn. Gen. Stat. § 53a-167(c)(a)(1) does not necessarily impinge an excessive force claim)

As noted in *Powell*, "[t]he Second Circuit has not determined whether a conviction for assault on a police officer would necessarily be impugned by a

finding that the officer or officers involved used excessive force while effecting the arrest." 390 F. Supp. 2d at 175. There, the district court held "…while plaintiff's conviction of assault on a police officer could be considered a factor in determining how much force was reasonable, a jury could still find that, under the circumstances, the amount of force used by that officer or other officers in effecting the arrest was unreasonable." *Id.* (citing *Smith v. Yonkers Police Dep't*, No. 91CIV3778, 1995 WL 489461, at *3 (S.D.N.Y. Aug. 16, 1995)).

Here, Defendants correctly note that Plaintiff's successful admission into Connecticut's accelerated pretrial rehabilitation program does not constitute a favorable termination for purposes of a § 1983 malicious prosecution claim. *Roesch*, 980 F.2d at 853 ("…we hold that a dismissal pursuant to the Connecticut accelerated pretrial rehabilitation program is not a termination in favor of the accused for purposes of a civil rights suit."); *see also Miles*, 445 F. App'x at 382-83 (summary order) (re-affirming that *Roesch* remains binding precedent). Plaintiff does not present any legal authority to the contrary. His argument that forcing defendants to challenge the criminal charges in the state proceeding presents a Hobson's choice is specious. Plaintiff must still confront the Responding Officers' testimony and statements to prevail at trial here.

Nevertheless, *Roesch* and *Miles* were both inapposite malicious prosecution cases based on well-established precedent that requires plaintiff to show a favorable termination. Plaintiff voluntarily dismissed his malicious prosecution claims. Those claims were clearly incompatible with the disposition of the criminal charges against him because the disposition establishes that there was probable

cause for his arrest. *See Lanning v. City of Glens Falls*, 908 F.3d 19, 24 (2d Cir. 2018).

Excessive force claims present a different issue. "The rule of *Heck v. Humphrey* does not ordinarily bar a claim that the police used excessive force against a civil rights plaintiff, even if the excessive force occurred in the midst of an arrest that eventually led to a successful conviction." *Hamlin v. McMahon*, No. 3:17 CV 1520 (RMS), 2019 WL 6619342, at *7 (D. Conn. Dec. 5, 2019) (quotation omitted and citing examples).

Defendants cite *Sampson v. Pia*, No. 3:15-CV-359 (SRU), 2017 WL 1138127 (D. Conn. Mar. 27, 2017) for the proposition that Plaintiff's conviction for two counts of assaulting a public safety officer is incompatible with his claim for excessive force. In *Sampson*, the plaintiff proceeded to trial and was acquitted of assault on a police officer but was found guilty of a lesser included offense of interfering with a police officer. *Id.* at 3. As instructed by the Second Circuit in *Sullivan*, the district court examined the record of the criminal trial. *Id.* at 7 (citing *Sullivan*, 225 F.3d at 166). It was undisputed that the police officer's contact with plaintiff was limited to striking him in the head with his service pistol to extract plaintiff from a vehicle. *Id.* During the criminal trial, the court instructed the jury that "[i]f you find that the force used by [police officer] was not reasonable, you will find that [police officer] was not acting within the performance of his official duties while attempting to arrest the defendant." *Id.* By finding plaintiff guilty, the jury had to conclude that force used to extract plaintiff from the vehicle was reasonable, which is incompatible with an excessive force claim. *Id.*

22

Defendants' argument is syllogistic rather than based on the facts as developed in the criminal proceeding as required by *Sullivan*. "In order to prove a violation of § 53a-167c (a)(1), the state must establish that the defendant "(1) inten[ded] to prevent (2) a reasonably identifiable officer (3) from performing his duty (4) by causing physical injury to such officer ..." *State v. Haughwout*, No. 20547, 2021 WL 3137796, at *7 (Conn. July 23, 2021). To be "performing his duty" in the context of an arrest, a police officer is authorized to use force pursuant to Conn. Gen. Stat. § 53a-22; *see Davis*, 261 Conn. at 570 (holding the trial court erred in failing to instruct the jury about the limitation on the use of force under state law).[2]

In this case, unlike *Pia*, the Defendants present no analysis of the facts established by the trial court as required by *Sullivan*. The Court need not address whether Plaintiff's participation in the accelerated pre-trial rehabilitation program constitutes a judicial admission of the elements of the offense because which acts would satisfy those elements remains ambiguous. *See Sullivan*, 225 F.3d at 166 ("… it is unclear which of Sullivan's acts formed the basis for his convictions. Indeed, lacking any transcript of the state court proceedings, it is difficult to perceive how such an inquiry could take place in this case.")

---

[2] **General Statutes § 53a–22 (b) provides that: [A] peace officer or authorized official of the Department of Correction or the Board of Parole is justified in using physical force upon another person when and to the extent that he reasonably believes such to be necessary to: (1) Effect an arrest or prevent the escape from custody of a person whom he reasonably believes to have committed an offense, unless he knows that the arrest or custody is unauthorized; or (2) defend himself or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent an escape.**

It is undisputed that the Responding Officers sustained minor injuries during the use of force incident. Ofc. McColgan testified that he felt "discomfort" in his right elbow, which he used to strike Plaintiff twice while he struggled with Det. Capowski. [Pl. Ex. C (Capowski Depo) at 40:07-40:24]. A reasonable jury could find that Ofc. McColgan gratuitously twisted Plaintiff's left arm with sufficient force to break his elbow because he felt discomfort after striking him. This finding would not be incompatible with elements of assault of public safety personnel because the unreasonable use of force occurred after the assault and exceeded the force necessary to effectuate the arrest. Similarly, Det. Capowski tackled Plaintiff prior to sustaining any injury. If a jury were to conclude that Det. Capowski's initial tackle was excessive, a verdict in Plaintiff's favor would not be incompatible with his conviction.

In this case, applying the *Graham* factors, factual issues preclude a grant of summary judgment for the defendants. First, despite his continued protestation, the Responding Officers had the right to enter Mr. Alvarez's driveway and question him about his unreasonable and bothersome behavior. *See United States v. Titemore*, 437 F.3d 251, 256-60 (2d Cir. 2006) (contrasting the reasonable expectation of privacy under the Fourth Amendment with traditional common law concepts of private property when police enter curtilage). The Responding Officers would likely have had probable cause to arrest Mr. Alvarez at the onset of their encounter.[3] To his credit, Ofc. McColgan testified that he attempted to de-escalate

---

[3] Under Connecticut law, "(a) A person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: …(2) by offensive or disorderly conduct, annoys or interferes with another person." Conn. Gen. Stat. §

the situation. [Pl. Ex. C (McColgan Depo.) at 11:03-11:07]("…I go to talk to the complainant to see what's going on. Because of the circumstances--it's Thanksgiving, be great to just--our goal is to settle it and have everybody go on very peacefully."). While Mr. Alvarez's behavior in response to Ofc. McColgan's efforts to deescalate the situation appears unreasonable, the seriousness and dangerousness of his potential criminal conduct at the inception of their encounter was slight.

As to the second *Graham* factor, as discussed *supra.*, there are factual disputes concerning Mr. Alvarez's behavior prior to being tackled by Det. Capowski. Both parties present admissible evidence tending to refute whether Mr. Alvarez was belligerent when questioned by the Responding Officers. Their observation of Mr. Alvarez's initial behavior is significant because it would inform them about whether Mr. Alvarez posed a safety threat.

More importantly, the sequence of events is disputed. Mr. Alvarez admitted that he walked away from Det. Capowski. Accepting Mr. Alvarez's account of what transpired, Det. Capowski grabbed his jacket and immediately tackled or pushed him to the ground without giving him the opportunity to comply with a verbal order or physical directive. Mr. Alvarez also denies resisting Det. Capowski's efforts to take hold of his jacket.

---

53a-182(a). Disorderly conduct is a class C misdemeanor. Conn. Gen. Stat. § 53a-182(b). Ofc. McColgan had reason to believe that Mr. Alvarez's behavior was intended to annoy his neighbor based on a previous arrest warrant application arising from allegations that Mr. Alvarez vandalized his neighbor's automobiles. *See* [Def. Local Rule 56(a)(1) Statement ¶ 58].

A reasonable police officer in Det. Capowski's position would be justified in using *some* degree of force to compel a suspect to remain with the officer while he conducted the investigation, particularly if proceeded by a verbal command. However, if a jury were to credit Mr. Alvarez's account, they might find that Det. Capowski's decision to almost immediately tackle a 66-year-old man without warning to be an unreasonable response to the minor risk posed by his attempt to leave the area.

Defendants emphasize that Det. Capowski's actions were in response to observing an axe in the direction Plaintiff was headed. Obviously, an axe is a dangerous and potentially lethal weapon. It is undisputed that Plaintiff did not physically threaten either of the Responding Officers, nor did he reach for the axe. In reply, the Defendants argue that "[i]t is absurd to argue that Capowski had to wait and see if Plaintiff would actually pick up the axe before Capwoski could take defensive measures," including "draw[ing] his service weapon and use deadly force to subdue Plaintiff." The Defendants' argument misses the mark.

While appreciating the uncertainty police officers face when dealing with impaired and potentially violent individuals, the preemptive use of force is not defensive.  Further, under these circumstances, the preemptive use of injurious force raises questions of reasonableness. Much like knives in a kitchen, the presence of an axe in a garage should not come as a surprise to a police officer. Crediting Mr. Alvarez's account, it is unclear that a reasonable police officer in Det. Capowski's position would have reasonably perceived the presence of an axe in a garage to be a threat, considering the absence of any specific gestures towards

26

the axe, or commands to step away from the axe, or prior threats or displays of physical resistance. The logical extension of the proposition that injurious force is warranted by the presence of a dangerous instrument is that policemen may use deadly force against anyone in any home as it is reasonable to assume that a home has a kitchen and the kitchen is equipped with knives. Alternatively, a jury could find that Det. Capowski exercise restraint by tackling Plaintiff onto piled sheetrock rather than the concrete floor.

Considering another perspective, Mr. Alvarez testified that Det. Capowksi tackled him after Ofc. McColgan yelled "don't let him go." This might suggest that Det. Capowksi was not responding to the presence of an axe in Plaintiff's vicinity, but rather direction from a fellow officer to detain Mr. Alvarez. If that were the case, it is possible that Det. Capowski tackled Mr. Alvarez without seeing the axe.

It is undisputed that Mr. Alvarez physically resisted the Responding Officers once he was on the ground. While physical resistance is an important factor in determining whether a police officer may use force, it is not dispositive in this case. Plaintiff testified that he resisted the Responding Officers by moving his body from side to side while Det. Capowski was on top of him; he did not attempt to strike either officer. At the summary judgment stage, the Court must draw all inferences in Plaintiff's favor, including the degree of force exerted to compel Plaintiff's submission considering the Responding Officers' relative physical ability and their relatively confined location.

For the above-mentioned reasons, the Court denies the Responding Officers' motion for summary judgment on count one of the Amended Complaint for excessive force in violation of the Fourth Amendment pursuant to § 1983. Interpreting the facts in a light most favorable to Plaintiff, a jury could conclude that reasonable police officers could disagree about the use of force exerted considering the totality of the circumstances.

The Responding Officers' do not cite any authority or raise arguments concerning interpretation of the state constitution. Accordingly, the Court also denies the Responding Officers' motion for summary judgment on count two of the Amended Complaint for excessive force in violation of Article First, § 8 of the Connecticut Constitution.

The Responding Officers moved for summary judgment on Plaintiff's failure to intervene claim based solely on the argument that Plaintiff cannot establish an underlying Fourth Amendment claim for excessive force. [Defs. Mem. in Supp. at 18]. Because genuine issues of material fact preclude summary judgment for the Responding Officers and a reasonable jury might conclude that they could have taken reasonable steps to intervene but failed to do so, the Court denies summary judgment as to count six. *See Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016).

C.  <u>Negligence and indemnification claims</u>

"Under Connecticut common law, the test to determine whether a municipal employee is entitled to governmental immunity for discretionary acts is distinct from the federal inquiry and requires separate consideration*." Fleming v. City of*

*Bridgeport*, 284 Conn. 502, 531–32, (2007) (citing *Mulligan v. Rioux*, 229 Conn. 716, 728, 643 A.2d 1226 (1994), *on appeal after remand*, 38 Conn. App. 546 (1995)). Common law immunity applies to the government official's discretionary act, like an arrest, unless one of three exceptions applies. *Id*.

"The three exceptions or circumstances [pursuant to subsection (a)] under which liability may attach even though the act was discretionary: first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm;… second, where a statute specifically provides a cause of action against a municipality or a municipal officer for failure to enforce certain laws;… and third, where the alleged acts involve malice, wantonness or intent to injure rather than negligence." *Evon v. Andrews*, 211 Conn. 501, 505 (1989) (internal citations).

The Responding Officers argue that the first exception does not apply because Plaintiff cannot show (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm. [Defs. Mem. in Supp. at 36-40] (citing *Martinez v. New Haven*, 328 Conn. 1, 8 (2018)). The Responding Officers further argue that the only recognized, identifiable class of foreseeable victims are schoolchildren attending school during school hours. *Id*. (citing *Kusy v. City of Norwich*, 192 Conn. App. 171, 183-184 (2019)).

However, "[C]ourts in this district have applied the identifiable person-imminent harm exception in the context of excessive force claims based on

affirmative acts where the harm to the individual is so foreseeable as to create just such a duty of care." *Ramos v. Town of E. Hartford*, No. 3:16-CV-166 (VLB), 2019 WL 2785594, at \*22 (D. Conn. July 2, 2019 (quoting *Belanger v. City of Hartford*, 578 F. Supp. 2d 360, 367 (D. Conn. 2008) (collecting cases); *see also Jefferson v. Reddish*, No. 3:12CV1543(WWE), 2017 WL 62510 (D. Conn. Jan. 4, 2017), at \*4 (denying summary judgment on negligence claim where "plaintiff could constitute an identifiable victim of the alleged harms caused by the force applied if such force is shown to be unauthorized as excessive"); *Bussolari v. City of Hartford*, No. 3:14-CV-00149 (JAM), 2016 WL 4272419, at \*4 (D. Conn. Aug. 12, 2016); *Roguz v. Walsh*, No. 9-CV-1052, 2012 WL 6049580, at \*9 (D. Conn. Dec. 5, 2012) (denying summary judgment on governmental immunity and applying imminent harm exception where "plaintiff was a clearly identifiable victim to Walsh, and it is undisputed that Walsh purposefully hit and swung his baton at plaintiff. Plaintiff was put at risk of imminent harm from Walsh's hits and baton swings").

Reading Plaintiff's facts in the light most favorable to him, Plaintiff was clearly identified to Responding Officers as the subject of the arrest, and both officers were public officials who knew that their conduct would likely subject Plaintiff to an imminent harm, whether that conduct was tackling him or striking him repeatedly and then breaking his arm.

Accordingly, the Court denies Defendants' motion for summary judgment on Plaintiff's state law negligence and indemnification claims.

## Conclusion

For the aforementioned reasons, the Court DENIES Defendants' motion for summary judgment [Dkts. 45] in its entirety. The Court GRANTS Plaintiff's motion to strike Defendants' Local Rule 56(a)(1) statement [Dkt. 48] and will disregard paragraphs 68 through 84 of Defendants' Local Rule 56(a)(1) statement. The Court DENIES Defendants' motion for an expansion of the page limitation for their Local Rule 56(a)(1) statement *nunc pro tunc*. [Dkt. 50].


IT IS SO ORDERED

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: September 15, 2021